# In the United States Court of Federal Claims

No. 22-1870
(Filed: July 18, 2025)
(Re-issued: July 25, 2025)[*]

* * * * * * * * * * * * * * * * * * * *

SIEMENS GOVERNMENT
TECHNOLOGIES, INC.,

                *Plaintiff*,

v.

THE UNITED STATES,

                *Defendant.*

* * * * * * * * * * * * * * * * * * * *

*Robert Nichols*, Washington, D.C., with whom were *Michael Bhargava* and *Logan Kemp*, for plaintiff, Siemens Government Technologies, Inc.

*Thomas J. Adair*, Trial Attorney, United States Department of Justice, Commercial Litigation Branch, Washington, D.C., with whom were *Yaakov M. Roth*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Deborah A. Bynum*, Assistant Director, for the defendant.

## OPINION

BRUGGINK, *Senior Judge*.

This breach of contract case arises from the U.S. Army Corps of Engineering's ("COE") energy savings project at Spangdahlem Air Force Base in Germany. Plaintiff—Siemens Government Technologies, Inc. ("Siemens")—advances various theories in support of one overarching proposition: defendant owes Siemens roughly $3,000,000, which is the

---

[*] This opinion was originally issued under seal to afford the parties an opportunity to propose redactions of protected information. The parties agree that no redactions are necessary.

amount Siemens spent bidding on the Spangdahlem project. Bringing claims under the Contract Dispute Act ("CDA") and this court's bid protest jurisdiction, Siemens sues in this court to recover those costs. Defendant moves to dismiss under Rule 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims. The matter is fully briefed, and the court held oral argument on June 10, 2025. For the reasons set out herein, we deny defendant's motion.

BACKGROUND[1]

I.    National Energy Conservation Policy Act

This case originates in 1978. That year, Congress enacted the National Energy Conservation Policy Act ("NECPA"). Pub. L. No. 95-619, 92 Stat. 3206 (1978) (codified at 42 U.S.C. § 8201 *et seq*). NECPA tasks the Department of Energy ("DOE") with overseeing the Act's energy savings program. *See* 42 U.S.C. § 8287. The program empowers DOE to award umbrella indefinite delivery, indefinite quantity ("IDIQ") energy savings performance contracts ("energy contracts") to energy contractors. *About Federal Energy Savings Performance Contracts*, Energy.gov (last accessed June 30, 2025), https://www.energy.gov/femp/about-federal-energy-savings-performance-contracts.

Under NECPA, an energy contract provides for the "design, acquisition, installation, testing," "operation, maintenance, and repair" of energy or water conservation measures. § 8287c(3); *see also* FAR 2.101. Congress designed energy contracts to "achiev[e] energy savings," along with other "ancillary" "benefits." §§ 8287, 8287c(3). An energy or water conservation measure is anything that improves energy or water use, is "life cycle cost effective," and involves, among other things, the conservation and improvement of energy and water operations and efficiencies. §§ 8259(4), 8287c(4)(A)–(B). And "energy savings" are "reduction[s] in the cost of energy, water, or wastewater treatment," an "increase[]" in the "efficient use of existing energy" and "water" "source[s]," the "sale or transfer" of excess energy or water, or "any revenue generated from a reduction in energy or water use." § 8287c(2)(A)–(F).

Furthering Congress' goal of securing energy savings, NECPA ties energy contractors' earnings to the amount of cost savings they can generate

---

[1] The facts are taken from the complaint and assumed to be true for purposes of ruling on defendant's motion.

for the government. So while energy contractors bear the cost of implementing energy savings measures, they get a cut "of any energy savings directly resulting from implementation of [energy savings] measures during" the contract's lifespan. § 8287(a)(1). Said differently, energy contractors' pay is performance-based, rather than a flat fee.

NECPA implements this incentive structure through a two-tiered procurement process. First, DOE awards an umbrella contract to an energy contractor, which makes the contractor eligible to bid on other federal agencies' energy projects. *See* § 8287(c).

Next, federal agencies can solicit bids from umbrella contract holders and award task orders for energy conservation measures. *See id.* The agency begins by notifying all umbrella contract holders that "the agency proposes to discuss energy savings performance services" and requesting "submissions" "of interest" and "contractor qualifications." § 8287(c)(1)(A). The agency then reviews energy contractors' submissions and selects one or more energy contractors "to conduct site surveys, investigations, feasibility designs and studies, or similar assessment[s] . . . ." § 8287(c)(1)(B), (D)(i)–(ii). Typically, those investigations take the form of preliminary assessments prepared by the energy contractors. *See* Am. Compl. ¶ 18. Then, the agency can issuance a notice of intent to award a task order, and the selected contractor prepares an audit prior to the issuance of a task order. *Id.* If satisfied with the audit, the agency can issue a task order—an entirely new contract—for energy savings services to the contractor. § 8287(c)(1)(F)–(G). The new task order contract will be between the agency and the contractor, while the contractor still retains the separate umbrella contract with DOE.

As relevant here, the umbrella contract contains a key additional provision. Section H.6.2 warns that "[t]he agency will not be responsible for any costs incurred, such as proposal preparation costs or the costs incurred in conducting the [investment grade audit] unless a [task order] is awarded or authorized by the [contracting] agency [contracting officer]." Am. Compl. ¶ 21.

II.    Siemens and Spangdahlem Air Force Base

On October 11, 2007, DOE awarded Siemens an umbrella energy contract. *Id.* ¶ 16. Eight years later, COE issued an opportunity notice for an energy savings project at Spangdahlem Air Force Base in Germany. *Id.*

3

¶ 22.  COE's goal was to reduce energy consumption and maximize reliance on renewable energy sources.  *Id.* ¶ 23.

Siemens responded to the opportunity notice, and COE sent Siemens two selection letters.  *Id.* ¶¶ 24–25.  The letters informed Siemens that it had been selected for the Spangdahlem project, explained that development costs were only recoverable for energy cost savings measures that were acceptable to the government and incorporated in the task order, and authorized Siemens to prepare a preliminary assessment.  *Id.* ¶¶ 26–27.

In March 2016, Siemens submitted its 110-page assessment.  *Id.* ¶ 28.  The assessment outlined thirty-seven energy conservation measures, which would cost $35,093,097 over 13.5 years.  *Id.*  The assessment predicted energy savings of $60,287,706 over the same period.  *Id.*

After reviewing the assessment, COE sent Siemens a notice of intent to award a task order and a request for proposal.  *Id.* ¶ 30.  Per the request for proposal, COE instructed Siemens to prepare an investment grade audit that would "includ[e] detailed cost and pricing data" for the energy conservation measures.  *Id.*

Four months later, COE and the Air Force met with Siemens to discuss the project.  *Id.* ¶ 31.  Air Force officers said that German labor regulations would apply to the project, but they assured Siemens that the government would meet with Germany's regional construction office and figure out which labor regulations would apply.[2]  *Id.* ¶ 32.

In the meantime, COE gave Siemens conflicting instructions on how to prepare the audit.  Originally, Siemens designed the audit as a single-phase study,[3] which meant that Siemens would provide recommendations for all thirty-seven energy conservation measures in one audit.  *See id.* ¶¶ 30, 33.  But by September 2016, COE had changed its mind and amended the request for proposal to require a two-phase study.  *Id.*  That meant Siemens would do two audits, the first for four conservation measures and the second for the

---

[2] Siemens does not tell us who was present or the specifics of what was said.

[3] Siemens cites no specific verbal or written instructions from COE regarding how COE wanted the audit prepared.  *See* Am. Compl. ¶¶ 30–32.  Nor does the umbrella energy contract shed light on what a single-phase study would look like.  *See* Mot. to Dismiss Attach. 1 at 40–41.

remaining measures. *See id.* COE gave Siemens a little over a month to complete the phase I audit. *Id.* ¶¶ 33, 35.

Siemens requested a time extension for the phase I audit, which COE denied. *Id.* ¶¶ 34–35. Siemens insisted it needed Spangdahlem's energy utility data and rate structure information before it could finish the audit. *Id.* ¶ 34. COE believed otherwise and refused Siemen's request. *Id.* ¶ 35.

Siemens nevertheless completed its phase I audit in October 2016. *Id.* ¶ 36. It later submitted a revised phase I audit in December 2016. *Id.* Three days later, the Spangdahlem Commander stated that the Air Force wanted a single-phase, not two-phase, audit. *Id.* ¶ 37. COE then rejected the phase I audit and told Siemens to start over. *Id.* ¶¶ 38–39.

While Siemens attempted to put together a new audit, another issue plagued its efforts: Auftragsbautengrundsatze 1975 ("ABG-75"). ABG-75 is an agreement between the United States and Germany that governs American military construction projects in Germany. *Id.* ¶ 40. Projects subject to ABG-75 must apply German labor regulations, which require that some construction tasks use unionized German labor. *Id.* Germany's regional construction offices decide whether ABG-75 applies to a project. *Id.* ¶ 41.

Siemens had encountered ABG-75 before. Specifically, Siemens dealt with ABG-75's application while working on a military project in Sembach, Rhineland-Pfalz, Germany. *Id.* ¶ 42.

Aware that ABG-75 could apply, Siemens asked COE during the July 2016 meeting whether ABG-75 would apply to the Spangdahlem project. *Id.* ¶ 43. COE assured Siemens that the government would ask the regional German construction office. *Id.* Yet by November 2016, COE had done nothing. *Id.* ¶¶ 44–45. Siemens's requests for clarification on the ABG-75 issue went unanswered until the Spangdahlem Command also pressed COE for an answer. *Id.* ¶ 47. Only then did COE reply, saying that it would reach out to the construction office. *Id.* ¶ 48. Meanwhile, Siemens designed the new audit on the premise that ABG-75 would not apply. *Id.* ¶¶ 48–50.

COE also did not respond to Siemens's requests for information on Spangdahlem's energy usage. Siemens repeatedly asked COE for Spangdahlem's energy usage statistics, as well as ABG-75's applicability. *Id.* ¶¶ 51–52. COE did not respond. *See id.* Siemens warned that completing its audit would be "very difficult" without Spangdahlem's energy statistics.

*Id.* ¶ 53.  COE still did not answer.  Lacking other options, Siemens met with Spangdahlem Command to discuss energy statistics.  *Id.* ¶ 54.  That prompted COE to finally respond, namely by reprimanding Siemens for meeting with Spangdahlem Command without notifying COE.  *Id.*

By March 2017, Siemens, along with Spangdahlem Command, again pressed COE for answers on ABG-75's applicability.  *Id.* ¶ 56.  Seven months later—and three months after Siemens submitted its new audit—COE finally met with the regional German construction office.  *Id.* ¶¶ 58–59.

German officials told COE that not only did ABG-75 apply to the Spangdahlem project, but that the project violated the treaty because "it involved the construction of a new natural gas facility by a contracting process" that transgressed German law.  *Id.* ¶ 59.  To avoid ABG-75's application, the German officials told COE that it would have to limit the project to repair, replacement, or renovation work.  *Id.*

COE turned to Siemens and ordered Siemens to fix the problem.  *Id.* ¶ 60.  Nevertheless, COE simultaneously warned that the Air Force was going to cancel the procurement.  *Id.*  Siemens reminded COE that ABG-75 was a "government to government issue to resolve."  *Id.* ¶ 61.  Still, throughout the balance of 2017 and early 2018, Siemens conferred with COE and German agencies in an effort to resolve the ABG-75 issue.  *Id.* ¶ 62.  Ultimately, Siemens joined forces with COE and Air Force and petitioned U.S. Air Forces in Europe[4] to request a waiver of ABG-75 for the Spangdahlem project from the German government.  *Id.* ¶ 63.

U.S. Air Forces in Europe refused to advance the requt.  *Id.* ¶ 64.  Citing the request's "political sensitivity," it advised that it "must be evaluated for its relative importance to other ongoing programs in Germany."  *Id.*  In the meantime, it considered "the project to be on-hold."  *Id.*

Even so, COE requested a third audit from Siemens for six non-construction energy measures.  *Id.* ¶ 67.  Siemens prepared the audit and submitted it in late 2018.  *Id.* ¶¶ 68–69.  Six months later, COE cancelled the Spangdahlem project altogether.  *Id.* ¶ 70.  In total, Siemens spent $2,889,715 preparing the assessment and three audits.  *Id.* ¶ 71.

---

[4] U.S. Air Forces in Europe is the overarching Air Force command in Europe.  *See About Us*, U.S. Air Forces in Europe – Air Forces Africa (last accessed July 8, 2025), https://www.usafe.af.mil/About-Us/.

### III.    Procedural History

In February 2020, Siemens submitted certified claims to COE and DOE for preparing its bid for the Spangdahlem project. *See id.* ¶ 74. Siemens cited the energy contract's section H.6.2, which granted COE discretion to cover bid preparation costs. *Id.* ¶ 74. COE denied Siemens's claim. *Id.* ¶ 76. DOE likewise denied Siemens's duplicative claim. *Id.* Siemens then sued here and at the Armed Services Board of Contract Appeals. (We later consolidated the Contract Appeals action with this case.)

While a bit confusing, we understand Siemens's claims as follows. First, Siemens's Count I claim is for a breach of contract pursuant to the CDA. For that claim, Siemens alleges that defendant breached the (express) umbrella energy contract between Siemens and DOE. That breach resulted, however, not from DOE's conduct but from COE's alleged wrongdoing. Specifically, Siemens alleges that COE's refusal to cover Siemens's bid preparation costs—as allowed by section H.6.2 of the energy contract— amounts to an abuse of discretion.[5] *See id.* ¶¶ 80–90. COE's abuse of discretion, in turn, breached the energy contract that Siemens had with DOE. *See id.* Said succinctly, COE's misconduct and abuse of discretion breached the *express* contract between DOE and Siemens.

Counts II and III are brought pursuant to our bid protest jurisdiction. Count II claims that COE also breached an *implied* contract that Siemens's alleges arose between it and COE when COE invited Siemens to bid on a task order award. Siemens alleges that an implied contract to fairly and honestly consider its bid was breached by COE's assertedly arbitrary and unreasonable conduct. *Id.* ¶ 93 (citing *Heyer Products, Co. v. United States*, 140 F. Supp. 409, 413 (Ct. Cl. 1956)). Having failed to act reasonably, COE, and by extension, the government, is liable for Siemens's bid preparation costs.

Under Count III, Siemens claims that defendant violated various FAR provisions which require that bidders receive a fair opportunity to compete for a task order. *See id.* ¶¶ 100–11.

Defendant moves to dismiss under Rule 12(b)(1) and (6). It argues that Counts II and III are barred by the Federal Acquisition Streamlining Act

---

[5] While Siemens lists "at least five ways" COE allegedly breached the energy contract, they boil down to an abuse of discretion argument. *See* Am. Compl. ¶¶ 84–89.

("FASA") while Counts I and II fail to state a claim. For the reasons set out below, we deny the motion.

DISCUSSION

I.    Standard of Review

Subject matter jurisdiction is the "threshold matter" before this court can consider a case's merits. *Golden v. United States*, 137 Fed. Cl. 155, 168 (2018). When a Rule 12(b)(1) motion challenges our jurisdiction, the plaintiff must establish jurisdiction by a preponderance of the evidence. *Williams v. United States*, 165 Fed. Cl. 72, 74 (2023). We view the complaint's allegations as true and construe them in a light most favorable to the plaintiff. *Id.*

To avoid dismissal for failure to state a claim under Rule 12(b)(6), "a complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). We accept all well-pleaded factual allegations as true and draw all reasonable inferences in plaintiff's favor. *Harris v. United States*, 868 F.3d 1376, 1379 (Fed. Cir. 2017).

II.    FASA Does Not Bar Siemens's Counts II and III Claims

Defendant argues that FASA bars Counts II and III of plaintiff's complaint.[6] FASA bars bid protests arising in connection with the issuance or proposed issuance of a task order. Both the assessment and the audits, defendant claims, were links in the direct causal chain leading to the possible issuance of a task order. Defendant thus concludes that Siemens's suit is in connection with a task order because the nonpayment of costs connects to actions that were in the direct casual chain leading to plaintiff's pursuit of a task order.

Siemens counters that FASA only applies to the *issuance or proposed issuance* of a task order, not just to any action related to a task order. Because Siemens does not challenge the non-issuance of a task order, but rather

---

[6] FASA does not apply to CDA breach-of-contract claims, *see Orbis Sibro, Inc. v. United States*, 117 Fed. Cl. 446, 455 (2014), and defendant (correctly) does not argue that FASA bars Siemens's Count I claims.

challenges defendant's refusal to cover Siemens's bid preparation costs, FASA does not apply.  We agree with plaintiff.

FASA provides that "[a] protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order" absent limited circumstances.  10 U.S.C. § 3406(f).  "Consistent with the statutory focus on 'issuance,'" FASA will bar a protest "if it challenges the issuance of the task order directly or by challenging a government action . . . whose wrongfulness would cause the task order's issuance to be improper." *Percipient.ai, Inc. v. United States*, 104 F.4th 839, 847 (Fed. Cir. 2024), *reh'g en banc granted and opinion vacated*, 121 F.4th 1311 (Fed. Cir. 2024) (mem.).[7]  Mere connection to a task order, however, is not enough for FASA to apply.  *See id.* at 849.  Rather, the protest must relate to the "issuance or proposed issuance of a task order" before FASA will bar the suit.  *Id.* (cleaned up).  Therefore, while FASA bars challenges to "government action[s] in the direct causal chain sustaining the issuance of a task order," not "all actions taken under or after issuance of a proper task order" are "directly and casually connected" to a task order's issuance.  *Id.* at 850.

FASA does not bar Siemens's suit.  Like the plaintiff in *Percipient*, Siemens does not "assert the wrongfulness of, or seek to set aside, any task order."  *Percipient*, 104 F.4th at 846–47.  Instead, Siemens pursues a purely monetary remedy:  reimbursement of the money it spent preparing the assessment and audits.  Am. Compl. ¶¶ at 28–29 (describing relief sought); *see also Percipient*, 104 F.4th at 851 (finding that FASA did not apply to Percipient's suit because its "requested relief would not alter" the task order's issuance); *SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1414 (Fed. Cir. 2014) (noting that the relief sought, although not dispositive, informs whether FASA applies).  Because Siemens does not challenge either "the issuance of the task order" or "a government action . . . whose wrongfulness would cause the task order's issuance to be improper," *Percipient*, 104 F.4th at 847, the bar is not applicable.

---

[7] In *Percipient*, the Federal Circuit granted the government's petition for rehearing en banc and vacated the panel opinion, reinstating the appeal. *Percipient*, 121 F.4th at 1312.  The Federal Circuit limited the rehearing to *Percipient's* standing component and instructed that "[t]he court will not revisit and does not require additional briefing on the" FASA bar.  *Id.* Thus, while the en banc court's order deprives the panel's "opinion of precedential effect," *O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975), the panel opinion remains "at least persuasive" authority for our court, *Crowson v. Washington County*, 983 F.3d 1166, 1187 n.10 (10th Cir. 2020).

Our recent decision in another Siemens lawsuit involving application of NECPA is instructive. *See Siemens Gov. Techs., Inc. v. United States*, 176 Fed. Cl. 450 (2025). There, Siemens sued to recover money it spent on energy savings assessments for six Navy bases. *Id.* at 453. Initially, the Navy awarded Siemens six contracts but later cancelled two of them after Siemens learned that the Navy had duplicate contracts for two of the bases. *Id.* at 454–55. Siemens sued to recover its bid preparation costs for those two bases. *Id.* at 455. Defendant moved to dismiss, arguing that FASA barred Siemens's claims. *Id.*

This court held that FASA did not bar Siemens's suit. First, the court noted that the preexisting contracts for energy savings services meant that the "task order was void from the start." *Id.* at 456–59. As relevant here, the court also ruled that FASA did not apply because "Siemens has never sought to set aside or generally interfere with any pending or issued task order; it only wishes to be made whole after being led astray by the U.S. Navy's false procurement needs—a claim FASA does not bar." *Id.* at 457. To be sure, this court acknowledged that if Siemens had tried to either "rescind the non-redundant task order or block award of a task order," that would be in connection to a task order and barred by FASA. *Id.* Instead, because "[n]o task order" would be revoked, this court ruled that FASA did not apply. *Id.* at 459.

So too here. Siemens's suit proceeds on an identical theory (wrongful government action means it can recover its bid preparation costs) for the same requested remedy (monetary damages). Thus, our decision in *Siemens* suggests the same result here.

Defendant's counterarguments are unpersuasive. First, defendant's primary approach—counting how often Siemens mentions the words "task order" or "procurement"—says little about whether Siemens challenges the issuance or proposed issuance of a task order.

Second, defendant cannot distinguish *Percipient*. While *Percipient* may be distinct in some regards, Siemens's pursuit of a wholly monetary remedy "mak[es] this case [more] like *Percipient*" than some of our other post-*Percipient* decisions. *Siemens*, 176 Fed. Cl. at 459. In *Computer World Services Corporation v. United States*, for example, we found that FASA barred a suit seeking to empanel a new technical evaluation committee because that would result in the court "effectively rescind[ing]" the task order award, which "[o]bviously . . . connects . . . to the task order." 173 Fed. Cl.

582, 586 (2024). Similarly, in *Radiance Technologies, Inc. v. United States*, we found that plaintiff's requested relief—changing solicitation language to "allow[] additional" "not currently qualified" bidders to submit offers— "would necessarily" affect the task order's issuance. 174 Fed. Cl. 197, 204 (2024). Other decisions are to similar effect. *See, e.g.*, *Prime Physicians, PLLC v. United States*, 174 Fed. Cl. 190, 196 (2024) (FASA barred challenge that targeted a solicitation's terms).

Third, defendant is incorrect that Siemens's claims are directly and causally connected to the issuance of a task order. It is true that section H.6.2 of the energy contract outlines the steps leading up to the agency's decision whether to award a task order. And it is also true that Siemens seeks to recover the money it spent following those steps. But it is not true that, in doing so, Siemens's claims are directly and causally connected to the issuance of a task order. To be so connected, Siemens would need to challenge the task order's language or defendant's decision not to award a task order. *Cf. Radiance Techs.*, 174 Fed. Cl. at 204 (applying FASA to a challenge to a solicitation's terms). Siemens does neither. All it asks is that defendant cover its bid preparation costs, a claim which is not connected directly to the issuance of task order. *See Siemens*, 176 Fed. Cl. at 459; *Percipient*, 104 F.4th at 851. Accordingly, given that Siemens's claims are not directly and causally connected to the issuance of a task order, FASA does not apply.

III.    Siemens States a Claim Under Count I for Breach of the Energy Contract

In this section, we analyze whether Count I of Siemens's complaint— which alleges that COE breached section H of the express energy contract that exists between Siemens and DOE—fails to state a claim.

Defendant argues that Siemens fails to state a claim for breach of contract. Defendant notes that the energy contract gave the contracting officer discretion as to whether defendant would pay for Siemens's bid preparation costs. As a result, it argues, Siemens cannot hold defendant liable for the contracting officer refusing to exercise that discretion. Further, defendant asserts that the Federal Circuit's decision in another Siemens lawsuit estops Siemens from arguing that defendant must pay for Siemens's bid preparation costs. *See Siemens Gov. Techs., Inc. v. Sec'y of the Navy*, 2024 WL 2043201, at *4 (Fed. Cir. May 8, 2024) (holding in a case in which the Navy awarded and then rescinded two task orders that the Navy was not required to pay for Siemens's bid preparation costs).

Siemens responds that it adequately pleads a breach of contract. Siemens notes that the energy contract, namely, section H.6.2, allows defendant to reimburse Siemens's bid preparation costs even if it does not mandate it. Under the circumstances, then, defendant abused its discretion by not authorizing payment of Siemens's bid preparation costs.

To show a breach of contract, Siemens must plead four things. *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). Those are (1) a valid contract exists between it and defendant, (2) there is an obligation or duty arising out of the contract, (3) defendant breached that duty, and (4) that breach damaged Siemens. *Id.*

The parties do not dispute that an express contract exists (i.e., the energy contract between Siemens and DOE) or that it gives defendant discretion to pay for bid preparation costs. Even so, when a contract gives the government "unilateral authority to make a decision affecting its contracting partner," the "government's 'judgment should be exercised not capriciously or fraudulently, but reasonably, and with due regard to the rights of both contracting parties.'" *27-35 Jackson Ave, LLC v. United States*, 127 F.4th 1314, 1319 (Fed. Cir. 2025) (quoting *Ripley v. United States*, 223 U.S. 895, 701–02 (1912)). Indeed, while the government's exercise (or non-exercise) of contractual discretion is often "conclusive," that discretion "is not without limits." *Id.* (quoting *Kihlberg v. United States*, 97 U.S. 398, 400 (1878)). Put another way, "[a] party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously." *Id.* (quoting *Pac. Far E. Line, Inc. v. United States*, 394 F.2d 990, 998 (Ct. Cl. 1968)). This duty satisfies the second element Siemens must allege.

Siemens also plausibly alleges that defendant, acting through COE, breached that duty when it abused its discretion in refusing to pay for Siemens's bid preparation costs under the energy contract with DOE. Siemens contends that it wasted millions of dollars preparing audits for a project which defendant should have known was untenable. Indeed, even while COE promised to investigate ABG-75's applicability, it dragged its feet for over a year before finally meeting with German officials. *See* Am. Compl. ¶¶ 32, 41, 43, 58. What is worse, Siemens alleges, is that COE's intransigence persisted despite multiple attempts by Siemens to clarify whether ABG-75 applied. *Id.* ¶¶ 44–48, 52–53, 55, 57. All the while, Siemens—relying on COE's assurances—racked up costs preparing audits for a doomed project. *See id.* ¶¶ 58–59.

Beyond mishandling ABG-75, Siemens plausibly alleges that COE did not provide Siemens with critical information. Siemens repeatedly requested information on energy usage at Spangdahlem—information that was critical for Siemens's audits. *Id.* ¶ 51. For example, Siemens warned that the lack of energy usage information would make "modeling" "the project" "very difficult to complete." *Id.* ¶ 53. COE did not respond. And when Siemens met with Spangdahlem Command to get the base's energy statistics, COE upbraided Siemens, saying that "Siemens MUST NOT meet with the Spangdahlem leadership without government participation AND advance knowledge of the meeting." *Id.* ¶ 54. Meanwhile, COE failed to provide critical information to Siemens. *Id.* ¶ 55.

Siemens also plausibly alleges that COE's about-face on how to prepare the audit further exacerbated Siemens's costs. Rather than consulting with Spangdahlem Command, COE wasted Siemens's time and resources preparing an audit that Spangdahlem Command did not want. *Id.* ¶¶ 33, 37. Worse, after COE discovered that ABG-75 applied, it asked for a third audit—which Siemens completed—even though it knew the Air Force was likely going to cancel the solicitation. *Id.* ¶¶ 60, 64, 66–70.

In short, Siemens plausibly alleges a breach of contract in that, but for COE's refusal to timely meet with German officials, provide energy statistics, and ascertain what kind of audit Spangdahlem needed, Siemens would not have spent approximately $3,000,000 on a project destined to go nowhere. Taken together, these allegations—which we assume to be true for the purposes of a motion to dismiss—plausibly establish that COE, and, by extension, defendant, abused its discretion by refusing to pay for Siemens's bid preparation costs. Plaintiff's claimed costs fill in the fourth element of the necessary pleading.

Defendant's objections fall short. While defendant insists that the exercise of "its unilateral discretion does not create a viable cause of action," Def.'s Reply in Support of Mot. to Dismiss at 12, that is misguided. Even when a contractual provision vests the government with "essentially unfettered discretion," contractors "can recover for the government's failure to exercise an option if the government's failure was in bad faith." *Vanquish Worldwide, LLC v. United States*, 147 Fed. Cl. 390, 401 (2020) (quoting *Dekatron Corp. v. United States*, 128 Fed. Cl. 115, 118, (2016)). And the Federal Circuit has recognized as much when the government terminates contracts for convenience. *See T&M Distributors, Inc. v. United States*, 185 F.3d 1279, 1283 (Fed. Cir. 1999) (holding that "the contracting

officer's election to terminate for the government's convenience is conclusive" absent "bad faith or [a] clear abuse of discretion").

In fact, defendant's own cases confirm what we noted earlier: defendant can be liable for abusing its discretion when exercising a unilateral contractual right. *See Vanquish Worldwide, LLC v. United States*, 164 Fed. Cl. 671, 686 (2023) ("A contractor can recover for the government's failure to exercise an option if the government's failure was in bad faith." (cleaned up)); *Kurkijan v. Sec'y of the Army*, No. 2020-2201, 2021 WL 3520624, at *5 n.1 (Fed. Cir. Aug. 11, 2021) (recognizing that failure to exercise an option "is not actionable unless the failure is motivated by bad faith or is arbitrary and capricious." (quoting *Kurkijan*, ASBCA No. 61154, 20-1 BCA ¶ 37,594)); *Hi-Shear Tech. Corp. v. United States*, 53 Fed. Cl. 420, 436 (2002) (similar), *aff'd*, 356 F.3d 1372 (Fed. Cir. 2004).

The energy contract obligated defendant to exercise its discretion "reasonably and fairly," not "arbitrar[ily] and capricious[ly]." *27-35 Jackson Ave*, 127 F.4th at 1320 (quoting *W.G. Cornell Co. of Washington, D.C., Inc. v. United States*, 376 F.2d 299, 313 (Ct. Cl. 1967)). Because Siemens has plausibly alleged that defendant's actions were arbitrary and capricious, it states a cognizable claim for breach of the energy contract.

Nor is Siemens's claim barred by issue preclusion. Defendant claims that Siemens's loss in its other NECPA case bars its CDA claim here because both involve the umbrella contract. Issue preclusion bars a subsequent cause of action if (1) the issue is identical to one decided in the first action, (2) the issue was actually litigated in the first action, (3) resolution of the issue was essential to final judgment in the first action, and (4) plaintiff had a full and fair opportunity to litigate the issue in the first action. *Angel v. United States*, 172 Fed. Cl. 102, 116 (2024).

The first step is not met here because the issues are not identical. In the Federal Circuit appeal, Siemens argued the issue of whether an awarded task order mandated that defendant pay for Siemens's bid preparation costs. *See Siemens*, 2024 WL 2043201, at *4. Here, Siemens argues that the energy contract permits—but does not require—the defendant to pay for Siemens's bid preparation costs and that defendant's refusal to do so constituted an abuse of discretion. Am. Compl. ¶ 89. As a result, the issues are not identical, and Siemens's argument is not precluded.

14

IV.    Siemens States a Claim Under Count II for Breach of the Implied
       Contract to Consider Bids Fairly and Honestly

In this section, we analyze whether Count II of Siemens's
complaint—which alleges that COE breached the implied contract to treat
bids fairly and honestly between itself and Siemens—fails to state a claim.

Defendant argues that the energy contract forecloses Siemens's
implied contract claim.  As noted, the energy contract contains a clause
vesting defendant with discretion on whether it will pay Siemens's bid
preparation costs.  As a result, defendant maintains that there cannot also be
an implied contract for preparation costs because the energy contract already
addresses that matter.  Nor can Siemens, according to defendant, use implied
duties to replace the energy contract's express language.

Siemens responds that it can advance its implied contract claim for
three reasons.  First, Siemens argues that its implied contract claim does not
relate to the same subject as the energy contract claim because one involves
DOE and the other is against COE.  Second, Siemens argues that its implied
contract claim is an alternative basis for relief if its express contract claim
fails.  Finally, Siemens argues that caselaw recognizes the viability of
implied contract claims in the procurement context.

Historically, "federal procurement decisions" were "largely immune
from judicial review" until *Heyer Products Company v. United States*.
*Validata Chem. Servs. v. U.S. Dep't of Energy*, 169 F. Supp. 3d 69, 75
(D.D.C. 2016).    In *Heyer*, the Court of Claims held that bidders on
government contracts possess "the right to have [their] bid[s] honestly
considered." 140 F. Supp. at 413.  If the government breaches that duty, "and
plaintiff is put to needless expense in preparing its bid, it is entitled to recover
such expenses."  *Id.* at 413–14.

While *Heyer* framed the government's duty narrowly, *see id.* at 414,
later decisions teach that the government's conduct breaches the duty so long
as it "is found to be 'arbitrary and capricious toward the bidder-claimant,'"
*Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed. Cir. 1998)
(quoting *Cent. Ark. Maint., Inc. v. United States*, 68 F.3d 1338, 1341 (Fed.
Cir. 1995)); *see also Zolon PCS II, LLC v. United States*, 176 Fed. Cl. 279,
296 (2025) (same).    And the enactment of the Administrative Dispute
Resolution Act did not eliminate *Heyer*-like claims; rather, it empowered this
court, through its grant of "jurisdiction over procurement bid protest
matters," *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326,

15

1342 (Fed. Cir. 2021), to "award any relief that the court considers proper," including monetary relief "limited to bid preparation and proposal costs," § 1491(b)(2); *see also Tender Years Learning Corp. v. United States*, 134 Fed. Cl. 336, 342 (2017) (describing the intersection between *Heyer*-like claims and this court's § 1491(b) bid protest jurisdiction).

At this stage, Siemens adequately pleads that defendant violated the duty to consider bids fairly.  As we explained above, Siemens plausibly alleges that COE acted arbitrarily and capriciously in failing to ascertain ABG-75's applicability, failing to provide needed energy usage information, and requiring multiple (and duplicative) audits, all of which increased Siemens's costs despite Siemens being ultimately ineligible for award.  As a result, Siemens has alleged enough facts at this early stage to overcome defendant's motion to dismiss.

Defendant's arguments are unavailing.  Principally, defendant contends that the energy contract precludes the existence of any implied contract.  That is mistaken.  True, an implied-in-fact contract cannot exist if an express contract already covers the same subject matter.  *Solaria Corp. v. United States*, 123 Fed. Cl. 105, 118 (2015), *aff'd*, 671 F. App'x 797 (Fed. Cir. 2016), *cert. denied*, 581 U.S. 940 (2017).  But the energy contract only addressed the contracting officer's authority to award bid preparation costs; it did not eliminate the government's inherent duty to treat bids fairly and honestly.  By failing to observe that duty, the government can be sued for bid preparation costs.  Thus, the energy contract does not preclude the implied contract to treat bids fairly.

## CONCLUSION

We deny defendant's motion to dismiss.  The parties shall file a Joint Status Report proposing further proceedings on or before August 8, 2025.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

16